# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

WILLIAM DRUMMOND, GPGC LLC, and )
SECOND AMENDMENT FOUNDATION, )    Civil Action No. 18-1127
INC., )
         )    Judge Marilyn J. Horan
           Plaintiffs, )
         )
    v. )
         )
ROBINSON TOWNSHIP and MARK )
DORSEY, Robinson Township Zoning )
Officer, in his official and individual )
capacities, )
         )
           Defendants. )

## OPINION AND ORDER

Plaintiffs William Drummond and GPGC LLC bring suit on their own behalf and on

behalf of their clients and customers. Compl. ¶¶ 1–2, ECF No. 1. Plaintiff Second Amendment

Foundation, Inc. (SAF), which has over 650,000 members and supporters across the nation,

brings suit on behalf of its members, including Plaintiff Drummond. *Id.* at ¶ 3. Plaintiffs allege

that Defendants, Robinson Township and Zoning Officer Mark Dorsey, infringed Plaintiffs'

Second Amendment right to keep and bear arms and Fourteenth Amendment rights to equal

protection, property, and livelihood by deliberately stalling Plaintiff Drummond's zoning

application in order "to zone the [Greater Pittsburgh Gun Club] out of existence." *Id.* at 1.

Counts I and II of the Complaint allege that Sections 601 and 311(D), respectively, of the

Robinson Township Zoning Ordinance, facially and as applied to Plaintiffs and their customers

and members, deprive Plaintiffs and their customers and members of their Second Amendment

right. *Id.* at ¶ 65. Similarly, Count III alleges that Table 208A of the Zoning Ordinance, as

applied to Plaintiffs and their customers and members, deprives them of their Second Amendment

1

right. *Id.* at ¶ 70. Counts IV and Count VI allege that Section 601, facially and as applied to Plaintiffs Drummond and GPGC LLC, violates the Fourteenth Amendment rights to equal protection and to the pursuit of livelihood, respectively. *Id.* at ¶¶ 73, 79. Finally, Count V alleges that Defendants' course of conduct deprived Plaintiff Drummond of his property interest, thereby violating the Due Process Clause of the Fourteenth Amendment. *Id.* at ¶¶ 75–76. Plaintiffs request an order permanently enjoining the enforcement of the challenged ordinances and commanding Defendants to issue Plaintiff Drummond all permits necessary for the operation of the Gun Club. *Id.* at 20. Plaintiffs also request an award of compensatory damages to Plaintiffs Drummond and GPGC LLC, declaratory relief consistent with the permanent injunctions, costs of suit, and attorney fees. *Id.*

Additionally, Plaintiffs seek a preliminary injunction in this matter. ECF No. 17. Plaintiffs request that the Court enjoin Defendants from enforcing Robinson Township Zoning Ordinance Table 208A and Sections 311(D) and 601 against Plaintiffs' operation and enjoyment of the Gun Club. *Id.* Plaintiffs also request that the Court command Defendants to issue all permits necessary for the operation of the Gun Club, to which Plaintiff Drummond alleges he would be entitled absent the Defendant Township's adoption of the aforementioned Zoning Ordinance Table and Sections. *Id.*

Defendants seek dismissal of the Complaint, ECF No. 26, first arguing that Plaintiffs' claims are not ripe. Defs.' Br. 6–8, ECF No. 27. Second, Defendants challenge Counts I and II, as they pertain to Plaintiffs' customers and members, arguing that Plaintiffs failed to properly plead derivative standing. *Id.* at 8–13. Lastly, Defendants ask the Court to dismiss all counts of the Complaint for failure to state a claim upon which relief can be granted. *Id.* at 13–20.

For the following reasons, Defendants' Motion to Dismiss will be granted and Plaintiffs' Motion for Preliminary Injunction will be denied as moot.

## I. Background

### A. Ownership and operation of gun clubs on the King Road property

According to the Complaint, the property at issue, 920 King Road, Bulger, Pennsylvania 15019, consists of 265 acres in a "substantially rural" area. Compl. ¶¶ 11, 13, ECF No. 1. In 1967, the property became the site of a gun club called the Greater Pittsburgh Trap & Skeet Club. *Id.* at ¶ 11. At that time, the property was zoned as "A-1." *Id.* The gun club, described by Plaintiffs as "operat[ing] as much as any ordinary commercial shooting range," *Id.* at ¶ 14, engaged in commercial activities such as renting guns to patrons and selling "memberships, range time, firearms, ammunition, targets, food and beverage, and other ordinary goods that might be found at any gun range, as well as shooting training and safety courses." *Id.* at ¶ 15. Ownership of the gun club changed hands at various points before the gun club ultimately ceased operations in 2008. *Id.* at ¶¶ 17, 20.

Eight years later, in 2016, Iron City Armory, LLC leased the King Road property with plans to open a new gun club. *Id.* at ¶ 21. When Iron City Armory entered the lease, the property was zoned as an Interchange Business Development District, or IBD District. *Id.* at ¶ 23. "Sportsman's Clubs," an undefined term at that time, were permitted principal uses within IBD districts. *Id.* at ¶ 12. In 2016, Iron City Armory submitted a zoning application to the Defendant Township. *Id.* at ¶ 22. The Defendant Township approved the application and issued a permit, which allowed Iron City Armory to operate a gun club on the property. *Id.* However, the permit was issued with restrictions; namely it prohibited "sales, gun testing, rentals, [and] other commercial endeavors." *Id.*

3

In December 2017, Iron City Armory announced that it would cease operations the following month and that it would default on its lease. *Id.* at ¶ 29. Plaintiff Drummond, a citizen of North Carolina, then entered into a ten-year lease of the King Road property with the intention of operating the Greater Pittsburgh Gun Club (referred to hereinafter as "the Gun Club") through GPGC LLC, an entity wholly owned by Plaintiff Drummond. *Id.* at ¶¶ 30–31. Plaintiff Drummond, through GPGC LLC, planned to run the Gun Club much as the pre-2008 gun club had been, by engaging in commercial shooting range activities. *Id.* at ¶ 31. Plaintiff Drummond took possession of the King Road property in or around January 2018. *Id.* at ¶ 32.

B. Past legal action involving the King Road property

According to the Complaint, and supported by attached exhibits, there have been two prior legal challenges related to the operation of a gun club on the King Road property. First, in 1993, a nuisance action was filed in state court by the Defendant Township. *Id.* at ¶ 18. In that action, the Township sought relief related to "the discharge of automatic weapons . . . ; the club's hours of operation; and projectiles leaving the premises and striking nearby properties." *Id.* Additionally, the Township admitted in its complaint that the gun club's operation was lawful under the then-existing Robinson Township Zoning Ordinance, wherein the property was zoned as A-1. *Id.*; *see also* Compl. Ex. A, ¶ 3, ECF No. 1-2. The state court dismissed the case in 1997, nearly four years after it was filed, finding that the gun club did not constitute a nuisance. Compl. ¶ 19, ECF No. 1. That gun club entity ceased operations in 2008. *Id.* at ¶ 20.

When Iron City Armory opened its gun club in 2016, neighbors of the King Road property appealed the Defendant Township's issuance of the permit to the Zoning Hearing Board. *Id.* at ¶ 23. The Board granted the appeal, reasoning that "shooting ranges" and "shooting range facilities" were not permitted uses in IBD districts. *Id.* During the pendency of the appeal, the

Township received complaints that Iron City Armory's gun club "was engaging in forbidden commercial activity by selling bottled water, targets, and ammunition to its members." *Id.* at ¶ 24. In response, the Township served Iron City Armory with a "Notice of Violation/Cease and Desist Order." *Id.* Additionally, an undercover police operation confirmed the gun club's sale of targets and ammunition, resulting in a second cease and desist order. *Id.* The Zoning Hearing Board ultimately revoked Iron City Armory's permit, which Iron City Armory appealed. *Id.* at ¶ 25. The Zoning Hearing Board denied the appeal, finding that Iron City Armory had violated the conditions of the issued permit. *Id.*

Iron City Armory appealed the Zoning Hearing Board's decisions to the Court of Common Pleas. *Id.* at ¶ 26. In that appeal, the Zoning Hearing Board admitted that the relevant ordinance "could be read to permit non-commercial gun clubs and shooting ranges in IBD districts." *Id.* at ¶ 27. Regarding the permit revocation, the court determined that selling bottled water and targets fell "into permissible commercial operations of a gun club and do not violate the restriction" and that the ammunition sales were de minimis. *Id.* at ¶ 28. Although Iron City Armory prevailed in the appeal, the court cautioned Iron City Armory against selling ammunition in the future, because doing so might run afoul of the permit restrictions. *Id.* at ¶¶ 26, 28.

C. Plaintiff Drummond's 2018 zoning application

When Plaintiff Drummond leased the property, with plans to open his own gun club, in January 2018, the King Road property was still zoned as an IBD district. *Id.* at ¶ 12. Plaintiff Drummond alleges that, in January 2018, he approached Defendant Mark Dorsey, Robinson Township Zoning Officer, and informed him of his plans for the property. *Id.* at ¶ 33. Plaintiff Drummond asked Defendant Dorsey about what he needed to do for Plaintiffs Drummond and GPGC LLC to open and operate the Gun Club. *Id.* On Defendant Dorsey's advice, Plaintiff

Drummond wrote and sent a detailed description of his plans for the Gun Club and the King Road property to Defendant Dorsey. *Id.* at ¶¶ 33–34. Defendant Dorsey did not respond to Plaintiff Drummond, despite "numerous follow-up phone calls." *Id.* at ¶ 34.

Plaintiffs further allege that on February 12, 2018, a neighbor, who had been involved in the previous nuisance action, attended a Robinson Township Board of Supervisors' meeting, where she "sought expedited action on restrictive zoning amendments targeting the Gun Club." *Id.* at ¶ 35. Defendant Dorsey and Township Manager Crystal Brown also were in attendance. *Id.* No one advised Plaintiff Drummond that the King Road property would be discussed at that meeting. *Id.* Four days after the meeting, Plaintiff Drummond contacted Defendant Dorsey. *Id.* at ¶ 36. Defendant Dorsey informed Plaintiff Drummond that he needed to submit additional information and that they would have to meet. *Id.* Plaintiff Drummond informed Defendant Dorsey that he had already provided all of the information about his plans for the King Road property. *Id.* Defendant Dorsey then told Plaintiff Drummond, for the first time, that he would need to submit a zoning application. *Id.* Defendant Dorsey also told Plaintiff Drummond that he did not need to immediately submit the application, as he could file it when they met in person. *Id.* Plaintiff Drummond emailed Defendant Dorsey later that day, seeking to clarify which form he needed to submit. *Id.* Defendant Dorsey did not respond to Plaintiff Drummond's email. *Id.*

On February 19, 2018, the Board of Supervisors met again "for the apparent purpose of considering restrictive zoning to preclude the Gun Club's operation." *Id.* at ¶ 37. Again, no one informed Plaintiff Drummond of this meeting, but neighbors, who had been involved in the previous legal actions, were present and spoke at the meeting. *Id.* Defendant Dorsey and Township Manager Brown were also present at the meeting. *Id.* Also on February 19, 2018, Plaintiff Drummond wrote to Defendant Dorsey to advise that they could meet on February 22,

2018. *Id.* at ¶ 38. Plaintiff Drummond also indicated that he wanted to submit the required paperwork "without further delay." *Id.* Defendant Dorsey did not respond to Plaintiff Drummond. *Id.* Plaintiff Drummond eventually reached Defendant Dorsey by telephone on March 1, 2018, and they arranged to meet, along with Township Manager Brown, on March 15, 2018. *Id.* at ¶ 39. Defendant Dorsey also requested more information about the Gun Club, which Plaintiff Drummond provided by email on March 7, 2018. *Id.* Defendant Dorsey did not respond to this email. *Id.*

At the March 15, 2018 meeting, Defendant Dorsey and Township Manager Brown instructed Plaintiff Drummond to fill out a zoning application. *Id.* at ¶ 40. Plaintiff Drummond did so, and Brown and Defendant Dorsey accepted it. *Id.* Neither Brown nor Defendant Dorsey mentioned the pending zoning ordinance that would preclude Drummond's application. *Id.* On March 19, 2018, as Plaintiff Drummond was driving back to North Carolina, a neighbor of the King Road property texted him, informing him about a notice posted on King Road. *Id.* at ¶ 41. The notice advised of an upcoming Special Meeting of the Board of Supervisors, which was scheduled for March 22, 2018. *Id.* The notice specified that the Special Meeting would address a zoning measure related to the Gun Club. *Id.* Plaintiffs allege that Defendant Dorsey and Township Manager Brown knew about the scheduled meeting, "but chose to conceal" it during their March 15, 2018 meeting with Plaintiff Drummond. *Id.* at ¶ 42. Plaintiffs further allege that Brown and Defendant Dorsey did this because they "knew . . . that the Township was plotting to adopt a zoning measure that would preclude Drummond's operation of the Gun Club . . . and that Drummond's efforts were being 'slow-rolled' so that he would be kept in the dark until the law had been changed." *Id.*

Plaintiff Drummond attended the March 22, 2018 Special Meeting, where he spoke in

opposition to the proposed zoning amendments. *Id.* at ¶ 43. The Board of Supervisors tabled the proposed amendments. *Id.* That night and over the following days and weeks, Plaintiff Drummond reached out to Defendant Dorsey and to the Township's Commissioners in an effort to confirm the status of his application and to offer to discuss any questions or concerns the Township might have about his plans. *Id.* at ¶ 45. Neither Defendant Dorsey nor the Commissioners responded to Plaintiff Drummond. *Id.* Further, no one informed Plaintiff Drummond that the proposed zoning amendment was on the Board of Supervisor's agenda for their April 9, 2018 meeting. *Id.* at ¶ 46.

At the April 9, 2018 meeting, the Defendant Township enacted the proposed amendments, as discussed below. *Id.* at ¶ 47. On April 16, 2018, Plaintiff Drummond went to the Robinson Township Municipal Building, where he learned about the Defendant Township's enactment of the amendment. *Id.* at ¶ 52. Plaintiff Drummond immediately contacted Defendant Dorsey to inquire about the amendments and the status of his zoning application. *Id.* Defendant Dorsey responded, providing copies of a letter he mailed on April 13, 2018 to inform Plaintiff Drummond that his application had been rejected. *Id.* at ¶ 53. The letter stated that the zoning application had been rejected because Plaintiff Drummond's plans for the Gun Club did not comply with the zoning amendments that were pending when Plaintiff Drummond submitted his application. *Id.* The following day, on April 17, 2018, Plaintiff Drummond sought information about how he might still get permission to operate the Gun Club, but Defendant Dorsey did not respond. *Id.* at ¶ 54.

According to Defendants' Brief in Support of the Motion to Dismiss, Plaintiff Drummond did not appeal the denial of his application to the Robinson Township Zoning Hearing Board. Defs.' Br. 4, ECF No. 27. Plaintiff Drummond instead appealed the Defendant Township's denial

of his application to the Washington County Court of Common Pleas in May 2018. *Id.* Plaintiff Drummond ultimately voluntarily dismissed his state court land use appeal, whereupon he filed this suit in August 2018. *Id.*

D. Defendant Township's zoning amendments

In the ordinance, enacted on April 9, 2018, the Defendant Township stated that it sought to regulate Sportsman's Clubs "in an effort to avoid nuisances and provide for and protect the public health, safety and welfare for the residents within the geographic limits of the Township." Defs.' Br. Ex. C, at 1, ECF No. 27-3. The ordinance amended the Robinson Township Zoning Ordinance in three ways. Compl. ¶ 47, ECF No. 1. First, the ordinance amended Section 601 to include a definition for "Sportsman's Club," a term that had been previously undefined. *Id.* Under the new definition, a "Sportsman's Club" is "[a] nonprofit entity formed for conservation of wildlife or game, and to provide members with opportunities for hunting, fishing or shooting." *Id.* Plaintiffs allege that by limiting the activities permitted at Sportsman's Clubs to nonprofit uses, the Defendant Township has barred Plaintiffs' operation of the Gun Club. *Id.* at ¶ 50.

Next, Section 311 of the Zoning Ordinance was amended to include paragraph D; this new paragraph provides that "[o]utdoor shooting activities shall be limited to pistol range, skeet shoot, trap and skeet, and rim-fire rifles." *Id.* at ¶ 47. According to the Complaint, this created a prohibition on center-fire rifles at Sportsman's Clubs, which "has significantly frustrated if not effectively barred the use of the historic King Road Gun Club property as a gun club or shooting range." *Id.* at ¶ 51.

Lastly, the ordinance amended Table 208A, which is a table of allowed uses in IBD districts. *Id.* at ¶ 47. Under the ordinance, Sportsman's Clubs were changed from Permitted Use to Conditional Use. *Id.* Plaintiffs also allege that under the Robinson Township Zoning

Ordinance, commercial outdoor shooting ranges are not permitted uses or conditional uses in IBD districts. *Id.* at ¶ 48. Plaintiffs further allege that there is no mechanism under the Zoning Ordinance "by which anyone might be allowed to operate a for-profit gun club or shooting range within an IBD district, or shoot center-fire rifles at a 'Sportsman's Club.'" *Id.* at ¶ 49.

## II. Motion to Dismiss

In deciding a motion to dismiss a complaint under Rule 12(b)(6), a court must first "accept all factual allegations as true" and "construe the complaint in the light most favorable to the plaintiff." *Eid v. Thompson*, 740 F.3d 118, 122 (3d Cir. 2014) (internal quotations omitted). The court then must "determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Id.* A complaint is sufficient only when it is facially plausible, meaning that the court is able "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). To be plausible on its face, the complaint must contain more than "[t]hreadbare recitals of the elements of a cause of action" and "mere conclusory statements." *Id.* The court need not "accept unsupported conclusions and unwarranted inferences." *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013).

Defendants put forward several arguments as to why Plaintiffs' Complaint should be dismissed. Specifically, Defendants assert that Plaintiffs failed to properly plead derivative standing on behalf of their customers and members; that Plaintiffs' claims are not ripe under the finality doctrine; and that Plaintiffs failed to state claims for which relief may be granted. Defs.' Br. 5, ECF No. 27.

A. Derivative standing

Turning first to the issue of standing, Defendants challenge Counts I and II, as they pertain to Plaintiffs' customers and members, arguing that Plaintiffs lack the required associational and third-party standing. *Id.* at 8. The Supreme Court has provided a three-part test to determine associational or organizational standing. First, in order for an association or organization to have standing on behalf of its members, the association must show that "'its members would otherwise have standing to sue in their own right.'" *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 365 (3d Cir. 2015) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). This prong of the test is met when the plaintiff association "make[s] specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). Second, the association must show that "'the interests it seeks to protect are germane to the organization's purpose'" and, third, that "'neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Neale*, 794 F.3d at 365 (quoting *Hunt*, 432 U.S. at 343). Regarding this last prong, participation of individual members is not necessary in cases where "the association seeks a declaration, injunction, or some other form of prospective relief," because "it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." *Hunt*, 432 U.S. at 343.

Here, Plaintiffs pleaded facts to satisfy each part of the test to establish Plaintiff SAF's standing. First, Plaintiffs allege that SAF has hundreds of thousands of members nationwide, including in Pennsylvania. Compl. ¶ 3, ECF No. 1. Plaintiffs further allege that Plaintiff Drummond is a member of SAF and that Plaintiff Drummond has been harmed by Defendants' acts. *Id.* at ¶¶ 3, 58. Second, Plaintiffs allege "[t]he purposes of SAF include promoting the exercise of the right to keep and bear arms; and education, research, publishing and legal action

focusing on the constitutional right to privately own and possess firearms, and the consequences of gun control." *Id.* at ¶ 3. Through the present lawsuit, SAF seeks to vindicate the Second Amendment rights of its members, including Plaintiff Drummond, through the invalidation of allegedly unconstitutional ordinances. *See id.* at ¶¶ 58, 61, 65, 70. Thus, the interests that SAF seeks to protect by bringing this suit are plainly germane to the association's purpose. Third, the participation of SAF members (aside from Plaintiff Drummond as the leaseholder and business owner) is not necessary to the claims SAF asserts nor to the relief SAF requests on their behalf. This is so because the relief sought by SAF is prospective: SAF seeks permanent injunctions against Defendants, preventing enforcement of the challenged ordinances and demanding issuance of land use permits, as well as corresponding declaratory relief. *Id.* at 20. Accordingly, as the Seventh Circuit has previously found, "[t]he Second Amendment Foundation . . . easily meet[s] the requirements for associational standing." *Ezell v. City of Chicago*, 651 F.3d 684, 696 (7th Cir. 2011).

Regarding Plaintiff Drummond's and Plaintiff GPGC's third-party standing to sue on behalf of their customers, the parties agree that "'vendors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function.'" *Teixeira v. County of Alameda*, 873 F.3d 670, 678 (9th Cir. 2017) (quoting *Craig v. Boren*, 429 U.S. 190, 195, (1976)), *cert. denied sub nom. Teixeira v. Alameda County*, 138 S. Ct. 1988 (2018). Defendants argue that in order to claim third-party standing on behalf of potential customers, "the would-be operator of the gun store must allege that residents are unable to otherwise exercise their Second Amendment rights to purchase firearms." Defs.' Br. 10, ECF No. 27. Plaintiffs dispute this, arguing that availability of other options bears on the merits of claim and not on standing. Pls.' Br. 14–16,

ECF No. 31. Plaintiffs and Defendants rely upon *Teixeira* for their respective arguments, but it is Plaintiffs' analysis that is correct. In *Teixeira*, the Ninth Circuit first held that the plaintiff, "as the would-be operator of a gun store," had standing to assert subsidiary Second Amendment rights on behalf of his potential customers. *Teixeira*, 873 F.3d at 678. The Ninth Circuit then moved into a discussion on the merits of the complaint, holding that the plaintiff's failure to plead unavailability of other gun stores was fatal under the plausibility requirement of Fed. R. Civ. P. 12(b)(6). *Teixeira*, 873 F.3d at 678–80. Therefore, Plaintiff Drummond and Plaintiff GPGC, as would-be operators of a commercial shooting range, have standing to sue on behalf of their potential customers.

Based on the foregoing analysis, Plaintiffs have properly pleaded standing to bring claims on behalf of their customers and members. The issue of availability of other commercial shooting ranges will be relevant to the merits of Plaintiffs' claims.

## B. Ripeness

Defendants also argue that Plaintiffs' claims are not ripe for adjudication because Plaintiff Drummond did not appeal the denial of his application to the Zoning Hearing Board. Defs.' Br. 6, ECF No. 27. The ripeness doctrine, ultimately derived from the "case or controversy" requirement of the Constitution, "addresses questions of timing, i.e., *when* in time it is appropriate for a court to take up the asserted claim." *Felmeister v. Office of Attorney Ethics*, 856 F.2d 529, 535 (3d Cir. 1988) (internal quotations omitted). Whether a claim is ripe for judicial review "'depends upon factors such as whether the agency action is final; whether the issue presented for decision is one of law which requires no additional factual development; and whether further administrative action is needed to clarify the agency's position.'" *Nextel Commc'ns of the Mid-*

*Atlantic, Inc. v. City of Margate*, 305 F.3d 188, 193 (3d Cir. 2002) (quoting *Felmeister*, 856 F.2d at 535–36).

Requiring the finality of administrative or agency action enforces the concreteness requirement of justiciability. *Peachlum v. City of York*, 333 F.3d 429, 437 (3d Cir. 2003). However, finality of administrative action should not be confused with exhaustion of administrative remedies; although they overlap, they are distinct concepts. *Id.* at 436. The finality requirement of the ripeness doctrine "is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury." *Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 193 (1985). Exhaustion of administrative remedies, on the other hand, "generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate." *Id.* A party may have a sufficiently ripe claim where the party suffers an actual, concrete injury prior to exhausting available remedial procedures.[1] *Peachlum*, 333 F.3d at 437.

Additionally, the finality requirement applies only to as-applied challenges to statutes or regulations, and not to facial challenges or course-of-conduct claims. *Cty. Concrete Corp. v. Township of Roxbury*, 442 F.3d 159, 164, 166 (3d Cir. 2006). A facial challenge asserts that any application of the statute or regulation at issue is unconstitutional; it is the "mere enactment" of the statute that causes injury, not a specific decision applying the statute. *Id.* at 164. Because there is no administrative action or decision that needs to be finalized, a facial challenge presents

---

[1] Plaintiffs and Defendants agree that exhaustion of administrative remedies "is not a prerequisite to an action under § 1983." *Patsy v. Bd. of Regents*, 457 U.S. 496, 501 (1982); Defs.' Br. 7, ECF No. 27; Pls.' Br. 3, ECF No. 31. Accordingly, their arguments focus on the finality requirement of the ripeness doctrine.

a concrete injury and, therefore, a ripe claim. *Id.* Likewise, a course-of-conduct substantive due process claim is not subject to the finality rule because the claim is based on conduct unrelated to the merits of the underlying application and the administrative decision. *Id.* at 166. The conduct is the concrete injury, separate and apart from any decision applying a statute or regulation. *Id.*

In contrast to facial challenges and course-of-conduct claims, an as-applied challenge attacks an administrative or agency decision that applied the statute or regulation at issue. *Id.* at 164. For an as-applied challenge to be ripe, the initial decisionmaker must have "'arrived at a definitive position on the issue.'" *Id.* (quoting *Williamson*, 473 U.S. at 192). In the zoning and land use context, the Supreme Court has held that "the local authorities should be given the opportunity to fully and finally determine the scope of the injury before federal claims ripen," because "[l]ocal zoning authorities are flexible institutions . . . that may 'give back with one hand what they have taken with the other.'" *Taylor Inv., Ltd. v. Upper Darby Township*, 983 F.2d 1285, 1294 (3d Cir. 1993) (quoting *MacDonald v. County of Yolo*, 477 U.S. 340, 350 (1986)). The Third Circuit has noted, "the flexibility inherent in local zoning systems 'is obviously useless if the property owners abandon their applications after rejection by civil servants with narrow authority and before seeking relief from a body with broader powers.'" *Id.* at 1294 n.16 (quoting *S. Pac. Transp. Co. v. City of Los Angeles*, 922 F.2d 498, 503 n.5 (9th Cir. 1990)). In sum, to have a ripe as-applied challenge to a zoning ordinance, a plaintiff must give the local zoning hearing board the opportunity to review the zoning officer's decision, so that the municipality can arrive at a final, definitive position. *Id.* at 1294.

Nevertheless, even if the decision underlying an as-applied challenge lacks a definitive position from the administrative body, the as-applied challenge may be sufficiently ripe where the

actions necessary to achieve a final decision would be futile.[2] *See Chassen v. Fid. Nat'l Fin., Inc.*, 836 F.3d 291, 296 (3d Cir. 2016) (recognizing futility as an exception to the ripeness doctrine). Drawing on the futility exception standard in the administrative exhaustion context, "a party must provide a clear and positive showing of futility before the District Court." *Wilson v. MVM, Inc.*, 475 F.3d 166, 175 (3d Cir. 2007).

Here, Plaintiffs bring facial and as-applied challenges to various portions of the Robinson Township Zoning Ordinance, as well as a substantive due process course-of-conduct claim. Because the finality requirement of the ripeness doctrine does not apply to Plaintiffs' facial challenges or the course-of-conduct claim, these claims are sufficiently ripe and thus are addressed on the merits, below. As regards Plaintiffs' as-applied challenges, Plaintiff Drummond did not appeal Defendant Dorsey's decision, which rejected Plaintiff Drummond's permit application, to the Zoning Hearing Board. Defs.' Br. 4, ECF No. 27. Because there has been no appeal to the Zoning Hearing Board, the Defendant Township has not had the opportunity to arrive at a final, definitive position. Plaintiffs contend that appealing to the Zoning Hearing Board would have been futile and a "complete waste of time" because Defendant Dorsey applied the letter of the law in rejecting the permit application—in other words, Plaintiffs argue that the Zoning Hearing Board had no grounds on which to reverse or alter Defendant Dorsey's decision. *Id.* at 7. Plaintiffs also argue that their plan to operate a gun club on the King Road property

---

[2] The futility exception to the ripeness doctrine may not apply to land use cases brought before courts within the Third Circuit, according to two unpublished Third Circuit opinions. *See Rucci v. Cranberry Township*, 130 Fed. Appx. 572, 579 (3d Cir. 2005) (finding a claim based on a land use decision to be unripe, and noting that "there is no futility exception to ripeness requirements in the Third Circuit"); *Holland Transp., Inc. v. Upper Chichester Township*, 75 Fed. Appx. 876, 878 (3d Cir. 2003) ("[W]e have not recognized the futility exception [to the finality requirement for ripeness] in land use cases."). However, due to the unpublished, and therefore non-precedential nature of these cases, this Court will address Plaintiffs' futility arguments.

qualifies for a variance, but that Defendants' position regarding the Motion for Preliminary Injunction—that the preliminary injunction should not issue because it would harm the community—forecloses that possibility. *Id.* at 7–8. However, these assertions are speculative, and as such do not present a sufficiently clear and positive showing of futility. The Zoning Hearing Board has the power "to grant variances and special exception permits," Defs.' Reply Br. 4, ECF No. 35 (citing Robinson Twp. Zoning Ordinance § 702(B)–(E)), and given the opportunity, the Zoning Hearing Board may come to a solution that resolves Plaintiffs' issues. Furthermore, a preliminary injunction is an "extraordinary remedy," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008), and Defendants' opposition to the issuance of such relief does not bear on whether the Zoning Hearing Board will come to a solution that Plaintiffs find satisfactory.

Therefore, the administrative decision underlying Plaintiffs' as-applied challenges lacks finality, and as such, Plaintiffs' as-applied claims do not present concrete harm. The as-applied challenges found in Counts I, II, III, IV, and VI thus are not ripe for adjudication and must be dismissed. Plaintiffs' facial challenges and course-of-conduct claim, which are not subject to the finality rule and are therefore ripe, are addressed on their merits below.

## C. Facial challenges to Township ordinances

Next, Defendants contend that the facial challenges in Counts I, II, IV, and VI, all brought under 42 U.S.C. § 1983, fail to state a claim for which relief can be granted. To establish a claim under § 1983, a plaintiff must allege that he was "deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999). Additionally, in a facial challenge, the plaintiff "seeks to vindicate not only his own rights, but those of others who may

also be adversely impacted by the statute in question." *City of Chicago v. Morales*, 527 U.S. 41, 55 n.22 (1999). Consequently, the plaintiff "'must establish that no set of circumstances exists under which the [statute] would be valid.'" *United States v. Mitchell*, 652 F.3d 387, 405 (3d Cir. 2011) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). This standard is particularly demanding, and, as the Supreme Court has noted, it is the "most difficult challenge to mount successfully." *Salerno*, 481 U.S. at 745. The Supreme Court has expressed disfavor for facial challenges, explaining that "'[c]laims of facial invalidity often rest on speculation' about the reach of a statute and 'run contrary to the fundamental principle of judicial restraint' by anticipating a constitutional rule before it can be decided." *United States v. One Palmetto State Armory Pa-15 Machinegun*, 115 F. Supp. 3d 544, 557 (E.D. Pa. 2015) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)). Because a successful facial challenge results in complete invalidation of the statute, courts "must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Wash. State Grange*, 552 U.S. at 450.

Counts I and II of the Complaint claim that Sections 601 and 311(D) of the Robinson Township Zoning Ordinance, each on its face, violate the Second Amendment. Counts IV and VI allege that Section 601, on its face, also violates the Equal Protection Clause and the right to pursue a livelihood, under the Privileges or Immunities and Due Process Clauses of the Fourteenth Amendment.

### 1. Second Amendment claims

The Second Amendment to the United States Constitution provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Supreme Court, in *District of*

*Columbia v. Heller*, suggested a two-pronged approach to Second Amendment challenges. *District of Columbia v. Heller*, 554 U.S. 570 (2008). First, courts are to "ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010). If the law does not impose a burden that falls within the Second Amendment's scope, then the inquiry is over. *Id.* If the challenged law does impose such a burden, courts move on to the second prong, under which they are to "evaluate the law under some form of means-end scrutiny." *Id.*

The rights protected by the Second Amendment are not without limitation. *Heller*, 554 U.S. at 626. The Supreme Court identified several limitations on the right to keep and bear arms that are derived from historical prohibitions, cautioning that "nothing in [*Heller*] should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, *or laws imposing conditions and qualifications on the commercial sale of arms.*" *Heller*, 554 U.S. at 626–27 (emphasis added). The Court described this list of regulatory measures as "presumptively lawful," which the Third Circuit has interpreted to mean "they regulate conduct outside the scope of the Second Amendment," not that they are within the scope of the Second Amendment but pass constitutional muster. *Marzzarella*, 614 F.3d at 91.

However, the Supreme Court's endorsement of "laws imposing conditions and qualifications on the commercial sale of arms" cannot be read as a categorical exception, because doing so "would be untenable under *Heller*." *Id.* at 92 n.8. As the Second Circuit noted, "the Court did not expand on why [this class] of restrictions would be permissible," but "the natural explanation is that time, place and manner restrictions may not significantly impair the right to possess a firearm for self-defense, and may impose no appreciable burden on Second Amendment

rights." *United States v. Decastro*, 682 F.3d 160, 165 (2d Cir. 2012). Thus, to determine whether

a condition on the commercial sale of firearms falls within or outside the scope of the Second

Amendment, "a court necessarily must examine the nature and extent of the imposed condition."

*Marzzarella*, 614 F.3d at 92 n.8.

In light of "*Heller*'s emphasis on the weight of the burden imposed by the D.C. gun laws,"

*Heller* does not "mandate that any marginal, incremental or even appreciable restraint on the right

to keep and bear arms be subjected to heightened scrutiny." *Decastro*, 682 F.3d at 166. Instead,

only "those restrictions that (like the complete prohibition on handguns struck down in *Heller*)

operate as a substantial burden on the ability of law-abiding citizens to possess and use a firearm

for self-defense" trigger heightened scrutiny, and thus are within the scope of the Second

Amendment. *Id.* (citing cases from other circuits, including *Marzzarella*, as supporting this

approach).

To decide whether a law imposes a substantial burden on Second Amendment rights,

courts have looked to other areas of constitutional law, particularly First Amendment

jurisprudence, for guidance. *See Heller*, 554 U.S. at 582, 595, 635; *Marzzarella*, 614 F.3d at 89

& n.4. Relevant here is the First Amendment analysis of time, place, and manner regulations.

*See Decastro*, 682 F.3d at 167–68 (applying First Amendment time, place and manner analysis to

decide whether a law operated as a substantial burden on the Second Amendment's protections).

Under this test, courts determine the reasonableness of a content-neutral time, place or manner

regulation of speech by asking whether the regulation "leave[s] open ample alternative channels

for communication of the information." *Id.* at 167 (quoting *Clark v. Cmty. for Creative Non-*

*Violence*, 468 U.S. 288, 293 (1984)). Such regulations may have the effect of "'reduc[ing] to

some degree the potential audience for [one's] speech,'" but this does not amount to an

unconstitutional burden "so long as 'the remaining avenues of communication are []adequate.'" *Id.* at 167–68 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 802 (1989)).

By analogy, a "law that regulates the availability of firearms is not a substantial burden on the right to keep and bear arms if adequate alternatives remain for law-abiding citizens to acquire a firearm for self-defense." *Id.* at 168. Likewise, a regulation on the placement of a gun range, or the type of activity allowed at a gun range, is not a substantial burden if adequate alternatives exist for law-abiding citizens to maintain proficiency in the use of firearms. *See id.* at 166 (noting that the majority in *Heller* found that there existed "laws of colonial cities regulating time, place and manner for the discharge of firearms," which "did not much burden self-defense and had a minimal deterrent effect on the exercise of Second Amendment rights").

If a burden exists that is substantial—for example, if gun range alternatives are inadequate—and therefore within the scope of the Second Amendment, then the next step is to apply a means-end analysis. *Marzzarella*, 614 F.3d at 89. The *Heller* Court did not define whether or when strict scrutiny or intermediate scrutiny applies to Second Amendment claims; it only stated that some form of heightened scrutiny is required. *Id.* at 95; *Heller*, 554 U.S. at 628 n.27 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect."). The Court did, however, distinguish between the core Second Amendment right—the right to keep and bear arms "in defense of hearth and home"—and other, ancillary rights. *Heller*, 554 U.S. at 635. Such ancillary rights include access to gun ranges and commercial gun and ammunition sales. *See Teixeira*, 873 F.3d at 677 ("the core Second Amendment right to keep and bear arms for self-defense wouldn't mean much without the ability to acquire arms" (internal quotations omitted)); *Jackson v. City & County of*

21

*San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) ("the right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them" (internal quotations omitted)); *Ezell*, 651 F.3d at 708 ("the right to maintain proficiency in firearm use [is] an important corollary to the meaningful exercise of the core right to possess firearms for self-defense").

Lower courts have used the Supreme Court's distinction between the core right and ancillary rights to develop a general framework for determining the appropriate level of scrutiny. Burdens on core Second Amendment conduct are more likely to receive strict scrutiny, while burdens on ancillary Second Amendment conduct are more likely to be reviewed under intermediate scrutiny. *Ezell*, 651 F.3d at 708. As the Seventh Circuit has noted, "laws restricting activity lying closer to the margins of the Second Amendment right, laws that merely regulate rather than restrict, and modest burdens on the right may be more easily justified. How much more easily depends on the relative severity of the burden and its proximity to the core of the right." *Id.* Additionally, in keeping with the First Amendment time, place, and manner paradigm—in which the Supreme Court held that intermediate scrutiny applies—time, place, and manner regulations of Second Amendment conduct should accordingly be reviewed with intermediate scrutiny. *Marzzarella*, 614 F.3d at 97–98. Intermediate scrutiny in this context thus "asks whether the regulation is narrowly tailored to serve a significant governmental interest and leaves open ample alternative channels." *Id.* at 98. The regulation does not need to be the least restrictive means of serving the government's interest, but it may not impose more of a burden than is reasonably necessary. *Id.* In other words, the fit between the regulation and the government's objective in enacting the regulation does not have to be perfect, but it should be reasonable. *Id.*

Here, Plaintiffs first seek invalidation of Section 601 of the Zoning Ordinance in Count I. Compl. ¶ 61, ECF No. 1. Section 601 defines "Sportsman's Club" as "[a] nonprofit entity formed for conservation of wildlife or game, and to provide members with opportunities for hunting, fishing or shooting." *Id.* at ¶ 47. Plaintiffs allege that by restricting Sportsman's Clubs to nonprofit entities, and thereby disallowing commercial activities, the ordinance violates the ancillary Second Amendment right of access to commercial gun sales. *Id.* at ¶¶ 59–61. In Count II, Plaintiffs also seek invalidation of Section 311(D), which limits outdoor shooting activities at Sportsman's Clubs to "pistol range, skeet shoot, trap and skeet, and rim-fire rifles." *Id.* at ¶ 47. Plaintiffs assert that this "blanket prohibition on the use of center-fire rifles, without sufficient regard to their suitability at a particular location, violates the right to keep and bear arms." *Id.* at ¶ 62.

By limiting gun range activities in IBD districts to nonprofit activities, Section 601 regulates the place where commercial gun sales and other for-profit commercial gun range activity may occur. Likewise, by limiting the types of activities that may occur at Sportsman's Clubs, Section 311(D) regulates the manner in which persons may maintain proficiency in firearm use in IBD districts. These ordinances are time, place, or manner regulations. Accordingly, the determination of whether any burden imposed is substantial is based on whether adequate alternatives exist. However, Plaintiffs do not plead any facts regarding the availability or absence of other commercial gun ranges or gun ranges where center-fire rifles may be fired. Moreover, Plaintiffs plead that commercial outdoor shooting ranges are allowed in other zones in the Township, *id.* at ¶ 48, and this fact supports the existence of adequate alternatives. Because Plaintiffs fail to allege a lack of adequate alternatives, Plaintiffs fail to plead that the burdens imposed by the regulations in Sections 311(D) and 601 are substantial. Plaintiffs thus fail to

sufficiently allege that the challenged ordinances are within the scope of the Second Amendment. Therefore, Plaintiffs' facial challenges in Counts I and II, which attack Sections 311(D) and 601 under the Second Amendment, must be dismissed for failure to state a claim. As such, the Court does not need to reach the means-end analysis in the *Heller* test's second prong.

### 2. *Equal protection claim*

Plaintiffs also challenge the validity of Section 601 of the Robinson Township Zoning Ordinance under the Equal Protection Clause of the Fourteenth Amendment, in Count IV of the Complaint. *Id.* at ¶¶ 71–73. The Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV, § 1. This means that if a law or regulation "creates distinctions between classes of people, and that action does not impermissibly interfere with fundamental constitutional rights or burden a suspect class," the law or regulation does not violate the Fourteenth Amendment "so long as it is rationally related to a legitimate government purpose." *Dungan v. Slater*, 252 F.3d 670, 674 (3d Cir. 2001) (citing *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976)). If such a distinction does interfere with fundamental constitution rights or burden a suspect class, then heightened scrutiny applies. *Brown v. City of Pittsburgh*, 586 F.3d 263, 283 n.22 (3d Cir. 2009). The level of heightened scrutiny is determined by the suspect classification or the fundamental right at issue. *Id.* (explaining that the First Amendment's time, place, and manner standard, which requires only intermediate scrutiny, applies in an Equal Protection Clause analysis of time, place, and manner restrictions as well). However, if the classification at issue in the equal protection claim implicates a fundamental right, but the plaintiff's separate claim based on that fundamental right fails, then the appropriate level of review for the equal protection claim is rational basis. *Ass'n of N.J. Rifle & Pistol Clubs v. Grewal*, 2018 U.S. Dist. LEXIS 167698, at *41 n.9 (D.N.J.

Sept. 28, 2018) (explaining that because the court determined that the plaintiffs' Second Amendment claim failed, the equal protection claim, which implicated Second Amendment rights, was subject to rational basis review rather than heightened scrutiny), *aff'd*, 2018 U.S. App. LEXIS 34380 (3d Cir. Dec. 5, 2018). Thus, to state an equal protection claim, a plaintiff must plead sufficient facts to show that the challenged law creates distinctions between classes of people and that the challenged law does not pass the appropriate constitutional means-end analysis.

Zoning schemes, by their very nature, create classifications based on uses and locations of land. They find their justification in the police power, and their scope may be defined by the law of nuisance. *See Brendale v. Confederated Tribes & Bands of Yakima Indian Nation*, 492 U.S. 408, 433–34 (1989) (discussing *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 387–88 (1926)). In other words, by separating land uses based on type or intensity, local governments aim to protect the public health, safety, and welfare and reduce the frequency of nuisances. *See id.* Land use classifications are generally subject only to rational basis review. *Congregation Kol Ami v. Abington Township*, 309 F.3d 120, 133 (3d Cir. 2002). However, land use decisions sometimes intersect with constitutionally protected classes or fundamental rights, as in the First Amendment time, place, and manner context, which results in the need for heightened scrutiny. *See id.*; *Brown*, 586 F.3d at 283. In the First Amendment context, so long as "'the state shows a satisfactory rationale for content-neutral time, place, and manner regulation, that regulation necessarily' survives scrutiny under the Equal Protection Clause." *Brown*, 585 F.3d at 283 (quoting *McGuire v. Reilly*, 260 F.3d 36, 49–50 (1st Cir. 2001)). By analogy, if a land use regulation of the time, place, or manner of the right to keep and bear arms passes muster under Second Amendment analysis, that regulation necessarily survives scrutiny under the Equal

Protection Clause. But, as noted above, if the regulation fails under Second Amendment analysis, then rational basis applies in the equal protection analysis of the claim. *Ass'n of N.J. Rifle & Pistol Clubs*, 2018 U.S. Dist. LEXIS 167698, at *41 n.9.

Here, Plaintiffs allege that Section 601 of the Zoning Ordinance treats Sportsman's Clubs differently from other businesses in IBD districts, in that it allows other for-profit activities in IBD districts but limits Sportsman's Clubs to only nonprofit activities. Compl. ¶ 73, ECF No. 1. Plaintiffs allege that the Defendant Township made this distinction in the zoning scheme "solely on account of activity secured by the Second Amendment." *Id.* Plaintiffs frame their equal protection challenge to Section 601 as a purely economic distinction, rather than as a land use classification, that interferes with a fundamental constitutional right. *Id.* at ¶ 72; Pls.' Br. 18–19, ECF No. 31. Based on interference with a fundamental constitutional right, Plaintiffs argue that strict scrutiny applies. Pls.' Br. 18, ECF No. 31. Plaintiffs also argue, in the alternative, that even if the Court views the profit-nonprofit distinction in Section 601 as a land use matter, thus subject to rational basis analysis, Section 601 still does not pass constitutional muster. *Id.* at 19.

First, regarding what type of classification Section 601 provides, a review of other portions of the Zoning Ordinance leads to the conclusion that Section 601 is a land use matter, not a purely economic one. The overall purpose of the Defendant Township's zoning scheme "is to establish zoning districts where compatible uses of land may be located." Robinson Twp. Zoning Ordinance § 200. The Zoning Ordinance groups allowed uses into various zones by means of several criteria, including intensity, meaning, the level of impact that certain uses may have on neighboring properties. *See id.* at §§ 202–09. For example, IBD districts "provide for businesses and high-impact land uses," while Industrial districts "provide appropriate areas for forms of heavy industry, major manufacturing and similar high-intensity uses that can have a higher impact

upon surrounding properties." *Id.* at §§ 208, 209. The Zoning Ordinance regulates commercial

outdoor shooting ranges, describing them as an "intensive" use and allowing them only in Special

Conservation and Industrial districts. *Id.* at §§ 202, 209, 602. The definition of "Commercial

Recreation, Intensive" includes commercial shooting ranges, but excludes "any non-profit

conservation organization or sportsman's organization, any noncommercial target shooting

conducted [on] private or public land, [and] any traditional hunting activities." *Id.* at § 602. The

Zoning Ordinance explains that a distinguishing characteristic of intensive commercial recreation

is "the intense level of impacts, such as noise from . . . gun fire." *Id.* It appears, then, that the

commercial nature of a shooting range is related to the intensity of land use and the impact that

such use may have on neighboring properties.[3] Thus, the profit-nonprofit distinction in Section

601 that Plaintiffs challenge here is a land use classification rather than simply an economic one.

Second, having already determined that Plaintiffs' Second Amendment claims fail, the

appropriate level of scrutiny for analyzing the land use classification in Section 601 is rational

basis review. Under rational basis review, a classification is unconstitutional "only when it rests

on grounds wholly irrelevant to the achievement of the State's objective." *Heller v. Doe*, 509

U.S. 312, 324 (1993) (internal quotations omitted). By addressing the compatibility and intensity

of land uses, the profit-nonprofit classification in Section 601 is more than relevant to the

Defendant Township's stated objective of nuisance prevention.[4] *See* Defs.' Br. Ex. C, at 1, ECF

No. 27-3. Therefore, Section 601 passes constitutional muster.

---

[3] Moreover, the commercial nature of land use is often used as a proxy for intensity of land use. *See, e.g.*, *Cmty. Servs. v. Wind Gap Mun. Auth.*, 421 F.3d 170, 183 (3d Cir. 2005) (noting that "[i]t is not unreasonable . . . to presume that 'commercial' facilities have a greater proportionate use of the municipality's sewer service as compared to 'residential' units").

[4] Plaintiffs argue that the 1993 lawsuit, in which the Washington County Court of Common Pleas concluded that the operation of the first gun club did not constitute a nuisance, precludes a finding of validity of the zoning amendments at issue here. Pls.' Br. 21–22, ECF No. 31. However,

However, even if heightened scrutiny did apply here, the standard would be at most intermediate, not strict. As discussed above, just as the level of scrutiny for First Amendment challenges carries over to corresponding claims brought under the Equal Protection Clause, *see Brown*, 586 F.3d at 283 n.22, the standard of scrutiny applicable to Plaintiffs' Second Amendment claims—intermediate scrutiny—would carry over as well, had the Second Amendment claims not failed under Rule 12(b)(6). The issue, consequently, would be whether Section 601 has a reasonable fit with, or is substantially related to, an important governmental interest. *See Marzzarella*, 614 F.3d at 98. Zoning is an important governmental interest, *Chez Sez III Corp. v. Union*, 945 F.2d 628, 633 (3d Cir. 1991); nuisance avoidance, as a part of the foundation of zoning law, is likewise an important governmental interest, *see Euclid*, 272 U.S. at 387–88. Section 601, on its face and within the greater scheme of the Zoning Ordinance, addresses intensity and compatibility of land uses. It therefore reasonably fits with and is substantially related to the Defendant Township's stated interest in avoiding nuisances. Section 601 ultimately may not be the least restrictive means, but it need not be under intermediate scrutiny review.

In sum, Plaintiffs did not establish that they were denied equal protection of the laws because they failed to plead facts showing that any distinction made by Section 601 was "wholly irrelevant" to the Defendant Township's objective. Furthermore, even if intermediate scrutiny applied, the fit between Section 601 and the Defendant Township's interest is reasonable.

---

nuisance actions are very fact-specific, and facts can change significantly over the course of twenty years. For example, at the time of the 1997 nuisance decision, the King Road property was zoned as an A-1 district. Compl. ¶ 11, ECF No. 1. Subsequently, the property was re-zoned to be an IBD district, in which commercial shooting ranges are not allowed, sometime before the 2016 litigation involving Iron City Armory. *See id.* at ¶ 23. Based on the fact-driven nature of nuisance actions and the passage of time, the Court finds that the prior nuisance action is not persuasive or controlling upon the instant case.

Therefore, Plaintiffs' facial challenge to Section 601 under the Equal Protection Clause, in Count IV of the Complaint, lacks merit and is dismissed.

### 3. Pursuit of livelihood claim

Finally, Defendants argue that Plaintiffs' last facial challenge to Section 601, in Count VI, also fails to state a claim for which relief can be granted. Defs.' Br. 20, ECF No. 27. Plaintiffs seek invalidation of Section 601 under the Privileges or Immunities and the Due Process Clauses of the Fourteenth Amendment, alleging that by "barring a profit interest in the operation of a gun club," Section 601 "violates the right to pursue a livelihood." Compl. ¶¶ 77–79, ECF No. 1.

The Fourteenth Amendment protects "[t]he right . . . to follow a chosen profession free from unreasonable governmental interference." *Piecknick v. Pennsylvania*, 36 F.3d 1250, 1259 (3d Cir. 1994). However, the Fourteenth Amendment secures only "the right to pursue a calling or occupation"; it does not secure the right to a specific job. *Id.* Consequently, state action excluding a person from one particular job is not actionable under the Fourteenth Amendment guarantee of the right to pursue a livelihood. *Id.* Plaintiffs assert that "Drummond and GPGC cannot make a living running a 'Sportsman's Club,' not just at the historic Greater Pittsburgh Gun Club, but anywhere in Robinson Township." Pls.' Br. 22, ECF No. 31. Plaintiffs' argument on this matter, however, is not persuasive. Plaintiffs allege that Plaintiff Drummond wishes to run the Gun Club in the same manner that the first gun club was run prior to 2008. Compl. ¶ 31, ECF No. 1. Plaintiffs describe the first gun club as "operat[ing] as much as any ordinary commercial shooting range." *Id.* at ¶ 14. Plaintiffs further recognize that the Township's Zoning Ordinance distinguishes between commercial outdoor gun ranges and Sportsman's Clubs. *Id.* at ¶ 48. Plaintiffs correctly conclude that under the current definition of Sportsman's Clubs, no Sportsman's Club can operate for a profit. However, commercial outdoor shooting ranges, which

can operate for profit, are permitted within Robinson Township, but not in IBD districts. Plaintiffs Drummond and GPGC LLC may be prevented from operating a for-profit shooting range on their property, but they have not been prevented from doing so elsewhere within Robinson Township. Consequently, Plaintiffs' argument that the amendment to Section 601 of the Robinson Township Zoning Ordinance violates the Fourteenth Amendment right to pursue a livelihood fails. Plaintiffs' facial challenge in Count VI of the Complaint is therefore dismissed.

D. Substantive due process claim

Lastly, Defendants contend that Count V of the Complaint also fails to state a claim for which relief may be granted. Defs.' Br. 17–19, ECF No. 27. In Count V, Plaintiffs allege that Defendants violated Plaintiffs' substantive due process rights under the Fourteenth Amendment by "frustrating and delaying" Plaintiff Drummond's zoning application through a "deceitful course of conduct." Compl. ¶¶ 55, 75, ECF No. 1. Specifically, Plaintiffs allege that Defendant Dorsey first advised Plaintiff Drummond to submit a detailed plan, *id.* ¶ 33, and then later advised Plaintiff Drummond to submit an application, but that the application did not need to be filed immediately, *id.* at ¶ 36; that Defendant Dorsey did not call or email Plaintiff Drummond back on several occasions to answer questions or provide advice, *id.* at ¶¶ 34, 36, 38–39, 45–46; and that Defendant Dorsey failed to notify Plaintiff Drummond of the pending hearings or ordinances, *id.* at ¶¶ 35, 37, 40, 42, 46.

In order to establish a substantive due process claim, a plaintiff must plead facts showing, first, that "the particular interest at issue is protected by the substantive due process clause" and, second, that "the government's deprivation of that protected interest shocks the conscience." *Chainey v. Street*, 523 F.3d 200, 219 (3d Cir. 2008). Presently, Defendants rely on Pennsylvania's pending ordinance doctrine to argue that Plaintiffs have not established a legal

right that is protected by the Substantive Due Process Clause. Defs.' Br. 18, ECF No. 27. Under this doctrine, "zoning ordinances that are pending before the City Council are treated as law even if they are not yet adopted." *Berger v. Cushman & Wakefield of Pa., Inc.*, No. 13-5195, 2014 U.S. Dist. LEXIS 86903, at *11 (E.D. Pa. June 25, 2014). Defendants maintain that because Plaintiff Drummond submitted his zoning application after the proposed zoning amendments were introduced, no substantive right to use the King Road property as a commercial gun range arose. Defs.' Br. 18, ECF No. 27.

However, Plaintiffs argue that the pending ordinance doctrine does not address the conduct that caused Plaintiffs' alleged deprivation. Plaintiffs claim that Defendant Dorsey's conduct that began in January 2018—a month before the February 2018 introduction of the proposed amendments—violated Plaintiffs' substantive due process rights. Compl. ¶¶ 33–34, 55, 75, ECF No. 1; Pls.' Br. 21, ECF No. 31. Plaintiffs assert that a property interest, protected by the Substantive Due Process Clause, existed in January when Defendants' alleged misconduct began. Compl. ¶¶ 74–76, ECF No. 1; Pls.' Br. 21, ECF No. 31. According to Plaintiffs, the property interest in operating the Gun Club as a commercial shooting range "inhered in decades of the Club's lawful operation." Pls.' Br. 21, ECF No. 31. Additionally, Plaintiffs claim that their plans for a commercial shooting range constituted a lawful use under the Zoning Ordinance prior to the February 2018 proposed amendment. Compl. ¶ 55, ECF No. 1. It is not entirely clear, but in the Complaint and subsequent filings in this case, Plaintiffs' assertions regarding their right to use the King Road property for commercial gun range purposes prior to the zoning amendment may not be correct. First, the facts indicate that how the King Road property was initially used is irrelevant to the current case. The first gun club operated as a commercial gun club from 1967 to 2008, during which time the property was zoned as A-1. *Id.* at ¶¶ 11, 14–15. In the nuisance

litigation in the mid-1990s, Robinson Township agreed that the gun club was a lawful use in the A-1 zone. *Id.* at ¶ 18. However, the property then ceased to be used as a gun club of any type, nonprofit or for-profit, from 2008 until 2016—a period of eight years. *Id.* at ¶¶ 20–21. Based on the zoning scheme in place in 2016 when Iron City Armory sought approval to open a new gun club, it appears that the property was re-zoned to an IBD district at some point prior to 2016. *Id.* at ¶ 23. Additionally, in this second gun club, Iron City Armory operated on a non-commercial basis, as evidenced by the permit restrictions that were the subject of the 2016 litigation in the Washington County Court of Common Pleas. *Id.* at ¶¶ 22, 24–25, 27–28. The lengthy cessation of commercial shooting range activities, combined with the fact that the property was rezoned to an IBD district—wherein Iron City Armory's gun club was only allowed to operate on a non-commercial basis—points to the conclusion that any right that may have inhered in the operation of the first gun club was subsequently lost.

Second, the current Robinson Township Zoning Ordinance, relevant to the present litigation, distinguishes between commercial shooting ranges and Sportsman's Clubs beyond the provisions Plaintiffs challenge in their Complaint. Plaintiffs, by their own admission, recognize this. *Id.* at ¶ 48; Pls. Br. 20, ECF No. 31. A closer look at the definition of "Commercial Recreation, Intensive," in Section 602 of the Zoning Ordinance, points to the conclusion that even prior to the February 2018 proposed amendment, Sportsman's Clubs could not be operated on a commercial basis. According to this definition, which Plaintiffs do not challenge, intensive commercial recreation includes "outdoor commercial shooting ranges," but excludes "shooting ranges owned by or operated by any non-profit conservation organization or sportsman's organization, any noncommercial target shooting conducted private or public land, or any traditional hunting activities carried out with Pennsylvania Game Commission regulations."

Robinson Twp. Zoning Ordinance § 602. In sum, the Zoning Ordinance appears to categorize Sportsman's Clubs among other nonprofit or non-commercial uses, and perhaps did so prior to the February 2018 proposed amendment.

The foregoing facts signal to the Court that Plaintiff Drummond's plans for the King Road property may not have been allowed to begin with—meaning that the property interest of which Plaintiffs claim they have been deprived may not exist at all. However, not only is this not entirely clear at this juncture based on the facts alleged, but Defendants do not make this argument. Because Plaintiffs allege a legal right existed, Defendants do not dispute this, and further factual development is needed, the Court assumes for the sake of argument regarding the substantive due process claim that a right exists.

Defendants next argue that even if the Complaint contained an adequately pleaded legal right, Defendant Dorsey's conduct at issue in this case does not shock the conscience. Defs.' Br. 18, ECF No. 27. Conduct that shocks the conscience "varies depending on the factual context." *United Artists Theatre Circuit, Inc. v. Township of Warrington*, 316 F.3d 392, 400 (3d Cir. 2003). The Third Circuit has held that "[t]o 'shock the conscience,' the alleged misconduct must involve 'more than just disagreement about conventional zoning or planning rules' and rise to the level of self-dealing, an unconstitutional 'taking,' or interference with otherwise constitutionally protected activity on the property." *Dotzel v. Ashbridge*, 306 Fed. Appx. 798, 801 (3d Cir. 2009) (quoting *Eichenlaub v. Township of Indiana*, 385 F.3d 274, 285–86 (3d Cir. 2004)). Generally, "[w]hat shocks the conscience is only the most egregious official conduct." *Eichenlaub*, 385 F.3d at 285 (internal quotations omitted). However, "[land] uses that implicate a *separately protected* constitutional right are analyzed differently than uses that do not implicate a separately protected constitutional right." *Tucker Indus. Liquid Coatings, Inc., v. Borough of East Berlin*, 656 Fed.

Appx. 1, 6 (3d Cir. 2016) (citing *Eichenlaub*, 395 F.3d at 285). Here, Plaintiffs allege that Defendants acted "with the purpose and effect of frustrating" Plaintiffs' exercise of their Second Amendment rights.[5] Compl. ¶ 75, ECF No. 1. However, having already determined that Plaintiffs failed to allege a violation of their Second Amendment rights, the issue here is whether Defendants' conduct—particularly the conduct of Defendant Dorsey—constitutes "the most egregious official conduct," not whether Defendants' conduct interfered with constitutionally protected activity.

The Municipal Planning Code (MPC) of Pennsylvania, which governs land use decisions, includes notice and publication requirements for municipalities that are considering changes to their zoning ordinances. *See, e.g.*, 53 Pa. C.S. §§ 10609(b), 10610. Beyond the obligations detailed in the MPC, case law is devoid of any requirement that municipalities and their zoning officers have a duty to inform landowners individually of pending legislation, upcoming zoning hearings, or actions taken at zoning hearings. Additionally, although zoning officers often dispense advice in the course interacting with the public on zoning issues, property owners who rely on that advice, even in good faith, do so at their own peril. *DeSantis v. Zoning Bd. of Adjustment*, 2011 Pa. Commw. Unpub. LEXIS 28, at *15 n.5 ("[V]ested rights cannot be gained by relying on the statements of mere ministerial officers, such as a zoning officer or his secretary.") (citing *Ferguson Township v. Zoning Hearing Bd.*, 475 A.2d 910, 912 (Pa. Commw. Ct. 1984)); *see also In re Appeal of Broad Mountain Dev. Co., LLC*, 17 A.3d 434, 444 (Pa. Commw. Ct. 2011) ("Generally, a municipal permit issued illegally or in violation of the law, or

---

[5] Plaintiffs also assert that Defendants "acted in derogation of the considered judgment of the Court of Common Pleas in the previous nuisance action," referring to the nuisance suit filed in 1993 and decided in 1997. Compl. ¶ 75, ECF No. 1. For reasons discussed above in footnote 4 regarding Plaintiffs' equal protection claim, the Court finds the previous nuisance action to be irrelevant to the current suit.

under a mistake of fact, confers no vested right or privilege on the person to whom the permit has been issued, and it may be revoked notwithstanding that the person may have acted upon the permit. Any expenditures made in reliance upon such permit are made at the person's own peril."). Allowing property owners to recover for their reliance in these situations "would have the effect of elevating and equating informal advice to official action." *Pequea Township v. Zoning Hearing Bd.*, 180 A.3d 500, 509 (Pa. Commw. Ct. 2018); *see also Cottone v. Zoning Hearing Bd.*, 954 A.2d 1271, 1280 n.8 (Pa. Commw. Ct. 2008) ("A zoning officer's gratuitous advice . . . is not a determination."). Furthermore, and importantly, "every person is presumed to know the extent of power of the municipal authorities." *In re Appeal of Broad Mountain Dev. Co., LLC*, 17 A.3d at 444.

As regards the zoning amendments at issue here, Plaintiffs do not allege that there were any procedural deficiencies in their enactment. In fact, Plaintiffs emphasize that there were no defects and that the enactment of the zoning amendments was procedurally sound. Pls.' Br. 7, ECF No. 31. A lack of procedural defect necessarily means that Defendants followed the notice and publication requirements of the MPC, and through the required notices, Plaintiff Drummond was put on notice of the timing and content of the zoning hearings. Essentially, by asking the Court to hold Defendant Dorsey accountable for not personally informing Plaintiff Drummond of the hearings and pending ordinance, Plaintiffs ask the Court to find that Defendants owed an additional duty to Plaintiff Drummond that generally is not owed to other property owners. That Defendants had the opportunity to personally notify Plaintiff Drummond, but did not act on it, does not excuse Plaintiff Drummond from being charged with knowledge of the pending amendments and hearings. The Court, therefore, is not persuaded that Defendants' inaction here, in light of a lack of duty to act, shocks the conscience.

In addition to allegations that Defendant Dorsey failed to personally notify Plaintiff Drummond of the pending proceedings, Plaintiffs argue that Plaintiff Drummond's reliance on Defendant Dorsey's advice, which Plaintiffs characterize as Defendants' "slow-rolling" and "stonewalling," amounts to interference with Plaintiffs' constitutional rights. Compl. ¶¶ 42, 55, ECF No. 1. To the extent Plaintiff Drummond relied on Defendant Dorsey's advice, he did so at his own peril. To charge Defendants with interference or conscience-shocking conduct on this ground "would have the effect of elevating and equating informal advice to official action." *Pequea Township*, 180 A.3d at 509.

Therefore, absent interference with any constitutionally protected activity and absent any conduct by Defendants that shocks the conscience, Plaintiffs' substantive due process claim under the Fourteenth Amendment, in Count V of the Complaint, fails and must be dismissed.

THEREFORE, based on the foregoing, Defendants' Motion to Dismiss is GRANTED and Plaintiffs' Complaint is hereby DISMISSED.

### III. Motion for Preliminary Injunction

In light of the dismissal, on various grounds, of each of Plaintiffs' claims, Plaintiffs' Motion for Preliminary Injunction is accordingly DENIED as moot.

DATE _January 22, 2019_

Marilyn J. Horan
United States District Judge